**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | |
| | **)** | **CRIMINAL NO. 3:13-16** |
| | **)** | |
| | **)** | **JUDGE KIM R. GIBSON** |
| **v.** | **)** | |
| | **)** | |
| **WARREN CHARLES GREEN, IV,** | **)** | |
| | **)** | |
| **Defendant.** | **)** | |

**MEMORANDUM OPINION AND ORDER**

**I.      Synopsis**

Pending before the Court is Defendant's Motion to Suppress Evidence and Statements. (ECF No. 121.) Defendant seeks to suppress evidence and fruits of evidence obtained during and after a search of his vehicle. Defendant asserts that he was subjected to an unlawful seizure, and that any evidence and statements recovered as a result of the seizure should be suppressed. For the reasons explained below, the Court will **DENY** Defendant's motion.

**II.      Background**

This matter arises from a search of Defendant's vehicle pursuant to a warrant on April 5, 2013, and statements made by Defendant after the seizure of over one kilogram of heroin from his vehicle following that search.

On April 16, 2013, Defendant was indicted on one count of possessing with the intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(i). (ECF No. 1.) On May 21, 2013, Defendant made his initial appearance, was arraigned, and pleaded not guilty. (*See* ECF Nos. 20, 21.)

On July 31, 2015, Defendant filed a Motion to Suppress Evidence and Statements. (ECF No. 121.) On December 3, 2015, the United States filed a response to Defendant's Motion. (ECF No. 132.) On February 24, 2015, Defendant filed a Motion for Leave to Supplement Motion to Suppress Evidence, which the Court granted the following day. (ECF Nos. 140, 141.) The proposed changes included in Defendant's Motion for Leave to Supplement were thereby incorporated in the Motion to Suppress Evidence. (*See* ECF Nos. 140, 141.)

On March 3, 2016, the Court held a Suppression Hearing regarding Defendant's Motion to Suppress Evidence. (*See* ECF Nos. 142, 144.) At the Suppression Hearing, the Government presented the testimony of one witness, Trooper First Class Michael Volk (**TFC Volk**). (*See* ECF No. 144.) The Government also introduced the following exhibits into evidence: (1) A Certificate of Speedometer Accuracy dated March 4, 2013 (Gov't Ex. 1); (2) A DVD copy of the dash-cam recording of the April 5 Stop (Gov't Ex. 2); (3) A Police Warning Notice dated April 5, 2013 (Gov't Ex. 3); and (4) An Application for Search Warrant and Authorization dated April 5, 2013 (Gov't Ex. 4).

The Defense cross-examined the Government's witness, but did not offer any additional testimony. The Defense introduced the following exhibits into evidence: (1) A DVD copy of the dash-cam recording of the April 3, 2013, traffic stop of Deon Triplett (Def. Ex. A); (2) A DVD copy of the dash-cam recording of the April 4 Stop (front camera) (Def. Ex. B); (3) A DVD copy of the dash-cam recording of the April 4 Stop (rear camera) (Def. Ex. C); (4) A DVD copy of the dash-cam recording of the April 5 Stop (part one of two) (Def. Ex. D); and (5) A DVD copy of the dash-cam recording of the April 5 Stop (part two of two) (Def. Ex. E).

Following the Suppression Hearing, Defendant filed Proposed Findings of Fact and Conclusions of Law with regard to the Motion to Suppress on April 22, 2016. (ECF No. 147.) The Government filed a Post-Hearing Brief on June 7, 2016. (ECF No. 154.) Defendant filed a Reply in Response to the Government's Post-Hearing Brief on June 9, 2016. (ECF No. 155.)

In support of his Motion to Suppress, Defendant makes four main arguments: (1) the April 5 Stop was not supported by probable cause and therefore violated the Fourth Amendment (ECF No. 147 at 20-24); (2) the continued seizure of Defendant beyond the time necessary to complete the purpose of the traffic stop (Defendant's alleged speeding) violated the Fourth Amendment (*Id.* at 24-32); (3) the frisk of Defendant was not supported by reasonable suspicion that Defendant was armed and dangerous and thus violated the Fourth Amendment (*Id.* at 32-35); and (4) these Fourth Amendment violations require suppression of the heroin found in Defendant's car and the statements made by Defendant (*Id.* at 35).

### III.    Findings of Fact

The Court makes the following findings of fact based on the evidence and testimony presented at the Suppression Hearing:

1.  TFC Volk is a Pennsylvania State Trooper stationed along the Pennsylvania Turnpike and has been so employed for over 24 years. (ECF No. 144 at 4:15-21.)

2.  TFC Volk is an intelligence officer with daily activities that includes "highway drug interdiction," or intercepting drugs, money, and guns being transported by way of the Pennsylvania Turnpike. (*Id.* at 4:22-5:7.)

3.  TFC Volk has spent the majority of his career doing drug interdiction with the state police in Western Pennsylvania, mostly on the Pennsylvania Turnpike. (*Id.* at 4:8-21.)

### a. The April 3 Stop

4. On April 3, 2013, TFC Volk was patrolling the Pennsylvania Turnpike in an unmarked cruiser equipped with lights and stopped a Chevy Impala for following too closely. (*Id.* at 29:13-16, 45:15-46:1, 46:22-23.)

5. Defendant was not present at this stop, but there was a dog in the vehicle that TFC Volk pulled over that TFC Volk later recognized during a separate stop of Defendant's vehicle. (*Id.* at 29:13-24.)

6. There were two men in the vehicle, with one in the driver's seat and one in the passenger's seat. (*Id.* at 47:5-6.)

7. TFC Volk asked the men whether they were traveling with the car that had been in front of them on the Pennsylvania Turnpike, because he had concerns that the car in front of them was a "lead car." (*Id.* at 47:9-14.)

8. TFC Volk told the men they had been following too closely, and asked for a driver's license. (*Id.* at 47:15-17.)

9. TFC Volk also learned that the car was a rental car that had been rented by the wife of one of the men, but the wife was not in the vehicle at that time. (*Id.* at 47:23-48:5.)

10. The individuals told TFC Volk that they were going to Long Branch, New Jersey to breed a dog. (*Id.* at 48:6-24.)

11. During the stop, TFC Volk looked in the backseat for approximately two seconds at the dog that the individuals were transporting, because the dog was noticeable to him. (*Id.* at 49:2-8, 49:24-50:2.)

12. TFC Volk was on the side of the individuals' rented vehicle for approximately one minute, and during that time, he did not see any luggage, drugs, guns, or large sums of money in the vehicle. (*Id*. at 50:10-18.)

13. TFC Volk returned to his cruiser and ran computer checks on the driver to see if the license was valid, if the vehicle was stolen, if the driver had a criminal history, and to see if anyone was available to help him, but found that no one was available. (*Id*. at 51:5-17.)

14. TFC Volk was in his cruiser for approximately one minute and a half before he returned to the side of the Impala and returned the driver's license and rental agreement documents, but TFC Volk did not give the driver a warning because the computer in his cruiser had not been working properly to print out a warning notice. (*Id*. at 52:6-23.)

15. TFC Volk began to walk back to his cruiser when one of the individuals in the vehicle called him back and offered to sell him a dog, saying, "they're American bullies, you want one?" (*Id*. at 53:2-19.)

16. TFC Volk was unsure of what type of dog the individuals were trying to sell because he does not know dog breeds by name. (*Id*. at 53:20-25.)

17. After the individual in the vehicle offered to sell TFC Volk a dog, he looked again in the back of the vehicle. (*Id*. at 54:4-9.)

18. This entire traffic stop lasted approximately four minutes, with TFC Volk next to the vehicle for approximately two minutes, during which the majority of the time he was speaking to the two men in the front seats. (*Id*. at 54:24-55:11.)

19. At the most, TFC Volk looked at the dog for a couple of seconds and had never seen the dog before that day. (*Id.* at 55:21-25.)

20. TFC Volk had noticed several "indicators" of criminal activity during this stop, including the use of a rental car, the person who rented the car not being present, the lack of luggage, the criminal history of the individuals, the fact that the men were being overly friendly and talkative. (*Id.* at 56:13-57:15.)

21. Once the individuals left, TFC Volk's cruiser's computer unfroze, and he learned that the two men were on pretrial release for federal drug violations in the Western District of Pennsylvania. (*Id.* at 58:6-9.)

### b. The April 4 Stop

22. On April 4, 2013, at approximately 8:00 a.m., TFC Volk pulled over an Impala, driven by Defendant, for a window tinting violation. (*Id.* at 20:2-14.)

23. At the same time, TFC Volk pulled over another vehicle, an Infinity, for not having a license plate in the back. (*Id.* at 62:7-10.)

24. TFC Volk believed that the Infinity and the Impala might have been traveling together, based upon the proximity between the two vehicles on the road. (*Id.* at 62:4-6, 72:2-7.)

25. TFC Volk approached the Infinity and learned that there was one occupant therein, a Caucasian male, who stated that he was traveling to Baltimore for work. (*Id.* at 63:12-64:4.)

26. TFC Volk collected the individual's driver's license, registration, and work ID, so that he could verify that the individual was traveling for work, because TFC Volk did not believe the individual's story about why he was traveling. (*Id.* at 64:5-16.)

27. TFC Volk left the Infinity, and approached the car in which Defendant was traveling, which was an Impala. (*Id*. at 65:7-9.)

28. There was no one else in the Impala with Defendant. (*Id*. at 20:15-17.)

29. TFC Volk approached Defendant's vehicle and had a conversation with Defendant during which Defendant told TFC Volk that he was traveling to Philadelphia to visit family, including his aunt, who lived there. (*Id*. at 20:18-24, 66:24-67:2.)

30. Defendant also spoke to TFC Volk about a cousin who was coming in from school, which TFC Volk thought was strange because he did not believe school ended for some time. (*Id*. at 74:10-14.)

31. In response to TFC Volk's question about how long he planned to stay in Philadelphia, Defendant stated, "I don't know, it all depends." (*Id*. at 21:3-5, 67:23-25.)

32. TFC Volk did not observe any luggage in Defendant's vehicle. (*Id*. at 21:6-10.)

33. TFC Volk returned to his cruiser and learned that Defendant had a valid driver's license and registration for the vehicle. (*Id*. at 66:9-16.)

34. As a result of this traffic stop on April 4, 2013, TFC Volk did a records check on Defendant, which revealed that Defendant had been arrested several times for drugs and guns violations. (*Id*. at 21:11-17.)

35. Approximately ten minutes after TFC Volk had returned to his cruiser, Trooper Brian Seifert arrived and spoke to TFC Volk, during which time TFC Volk told Trooper Seifert that the individuals in the Infinity and the Impala were not traveling together even though he previously believed that they might have been. (*Id*. at 71:5-23.)

36. Even though the Infinity and the Impala were not traveling together, TFC Volk still believed they both might be "super special," which he told to Trooper Seifert, meaning that he believed they were both engaged in criminal activity based on several indicators he observed with respect to the individuals in each car. (*Id.* at 72:22-73:3.)

37. TFC Volk gave Defendant a warning for the window tint violation, gave Defendant his documents, and told Defendant he was free to leave. (*Id.* at 22:3-10.)

38. After telling Defendant he was free to leave, TFC Volk requested Defendant's consent to search the vehicle. (*Id.* at 22:11-24.)

39. Defendant gave consent for TFC Volk to search his vehicle, stating, "No, not at all. I don't mind you searching my car," and further stated that his father was a police officer. (*Id.* at 77:23-78:4.)

40. Defendant denied having been traveling with the individual in the Infinity. (*Id.* at 78:10-15.)

41. Defendant stood with Trooper Seifert while TFC Volk did a hand and visual search of the vehicle and found that the trunk was not able to be opened from the exterior, but rather had to be accessed by folding down the seat of the vehicle. (*Id.* at 23:4-7, 78:17-23.)

42. TFC Volk also noticed that the liner of the trunk was pulled back and a smell of raw marijuana was emanating from the trunk area, but did not locate a source for this odor. (*Id.* at 23:18-20, 84:10-12.)

43. TFC Volk found no evidence of drugs in the trunk on April 4, 2013, but the fact that the trunk could not be opened from the outside, coupled with the odor of marijuana, concerned TFC Volk. (*Id*. at 24:8-16.)

44. After having opened the trunk but not finding anything, Defendant was free to proceed eastbound on the Pennsylvania Turnpike. (*Id*. at 24:17-19.)

45. The search of Defendant's vehicle on April 4, 2013, lasted approximately 12 minutes, and the entire stop with Defendant on the side of the road lasted approximately 50 minutes. (*Id*. at 87:17-25.)

### c. The April 5 Stop

46. On April 5, 2013, TFC Volk was working a daylight shift in his capacity as an intelligence officer doing drug interdiction in a marked Pennsylvania State Police cruiser on the Pennsylvania Turnpike. (*Id*. at 6:23-7:12.)

47. At approximately 10:00 a.m. on April 5, 2013, TFC Volk saw Defendant's vehicle go by as he was finishing up a stop of another vehicle, and began following Defendant's vehicle. (*Id*. at 8:20-9:6.)

48. TFC Volk began following Defendant's vehicle because he recognized the vehicle, though he did not know it was Defendant driving, and he planned to find a reason to stop the vehicle. (*Id*. at 91:15-19.)

49. TFC Volk traveled westbound, and once he came into the line of sight of Defendant's vehicle, he began to "clock" the vehicle, meaning that he kept equal distance between his cruiser and Defendant's vehicle to give an accurate representation of how fast Defendant's vehicle was going based on the cruiser's speedometer. (*Id*. at 9:9-19.)

50. While TFC Volk clocked Defendant, there were approximately one-tenth to two-tenths of a mile between TFC Volk's cruiser and Defendant's car. (*Id.* at 97:2-4.)

51. TFC Volk clocked Defendant's vehicle for six-tenths of a mile, from approximately mile marker 115.8 to 115.2 on the Pennsylvania Turnpike, and determined that he was traveling at 79 miles per hour. (*Id.* at 10:11-24, 90:13-20.)

52. After clocking Defendant traveling at 79 miles per hour, TFC Volk sped up to catch up to Defendant's vehicle, activated the lights on top of his cruiser, and pulled him over for speeding, approximately at mile marker 114. (*Id.* at 13:7-14, 99:12-14; Def. Ex. D at 0:10-1:03.)

53. TFC Volk approached Defendant's vehicle, looked inside, and stated, "You again." (ECF No. 144 at 18:3-8; Def Ex. D at 1:20-1:30.)

54. TFC Volk said, "You again," because he remembered Defendant from having pulled him over traveling westbound on the Pennsylvania Turnpike the day before, on April 4, 2013. (ECF No. 144 at 18:10-20.)

55. In response to TFC Volk asking Defendant how he was doing, Defendant stated, "I can't complain, I got a dog." (*Id.* at 103:1-5.)

56. There was no one in Defendant's car with him other than a dog in the back seat of the vehicle. (*Id.* at 18:22-19:4.)

57. Defendant began asking TFC Volk how his day was going, and in response to TFC Volk's question about why he hadn't stayed in Philadelphia for a couple of days, Defendant stated that his daughter broke a bone. (*Id.* at 25:7-17.)

58. Defendant also talked to TFC Volk about the dog in the back seat of the vehicle. (*Id.* at 26:1-2.)

59. The dog in Defendant's vehicle on April 5, 2013, was familiar to TFC Volk, as it appeared to be the same dog that had been in a vehicle he had stopped in a separate traffic stop with a different individual in the car also going eastbound on the Pennsylvania Turnpike a few days earlier, on April 3, 2013. (*Id.* at 19:7-12.)

60. TFC Volk believed that Defendant was behaving in an overly friendly manner, and thought he was "tight," which means that he was trying very hard not to be nervous. (*Id.* at 26:3-8.)

61. Defendant was leaning toward TFC Volk, asking about TFC Volk's day, getting off subject, talking about the dog in his car, and engaging in nervous chatter. (*Id.* at 26:8-10.)

62. TFC Volk also noticed that Defendant would not "square up with" him, meaning that he would not speak face-to-face with TFC Volk, and kept himself planted against the trunk lid in a "flight-type of posture." (*Id.* at 30:24-31:1, 15-16.)

63. In addition, TFC Volk took note of the fact that Defendant contradicted his story about the dog and went into elaborate details about the dog's ears, but didn't know the details about the kennel at which his dog was staying. (*Id.* at 31:1-3.)

64. TFC Volk believed that Defendant's contradictions about the dog meant that he was making up a story and describing the breeder to try to explain the reason for his travel. (*Id.* at 31:23-32:2.)

65. In TFC Volk's experience, these behaviors told him that Defendant was nervous about what might happen, and TFC Volk was alerted by this type of behavior. (*Id*. at 11-16.)

66. TFC Volk called Trooper Jeff Brautigam, who was a trooper with the drug dog division with whom TFC Volk had worked on a regular basis. (*Id*. at 26:20-25.)

67. TFC Volk stated to Trooper Brautigam, "You're not going to believe this, I just got him right now by accident," and also told him about the individuals he had stopped on April 3, 2013, who were traveling with the dog in their car, and indicated that he believed Defendant was traveling with the same dog. (*Id*. at 27:2-10, 105:20-106:13.)

68. TFC Volk had spoken to Trooper Brautigam about Defendant after finishing the stop the day before, on April 4, 2013, because he wanted to know if anyone knew of Defendant or if he was known to be involved in drug activity. (*Id*. at 27:17-23.)

69. TFC Volk asked these questions because of his observations of Defendant during the stop on April 4, 2013, including his lack of luggage, the fact that he was going to Philadelphia without a set time frame, the inability to open his trunk from the outside, the smell of raw marijuana emanating from Defendant's trunk, the fact that the records check run on Defendant showed several drug and weapons violations in the past. (*Id*. at 27:21-28:17.)

70. On the phone on April 5, 2013, TFC Volk also spoke to Trooper Brautigam about the dog in the backseat of Defendant's vehicle, and explained that it was the same dog as one he had seen during his stop of other individuals believed to be involved in drug related activity on April 3, 2013. (*Id*. at 28:20-29:12.)

71. TFC Volk issued Defendant a warning notice based on his speeding violation, and then greeted Defendant goodbye. During this conversation, Defendant discussed the breeder of the dog he was transporting and referred to the breed as Presa Canarios and Cane Corsos. (*Id*. at 32:23-33:4, 34:5-8, 110: 8-11; Gov't Ex. 3.)

72. After completing the citation portion of the interaction, TFC Volk reengaged Defendant in an encounter because he ultimately wanted to ask Defendant for consent to search the vehicle based upon all of the indicators he had observed over the past three days— dating back to the April 3, 2013, traffic stop with the dog. (ECF No. 144 at 33:10-21.)

73. TFC Volk asked whether there was anything in the trunk that should not be there, and asked for permission to search his vehicle, but Defendant denied consent to search. (*Id*. at 34:5-15.)

74. After Defendant denied consent to search the vehicle, TFC Volk told him to have a seat and that he would be back with him in a little bit, so Defendant went back to his car and sat in it. (*Id*. at 122:9-21.)

75. TFC Volk then tried to get a canine to come because he believed that he had enough reasonable suspicion to conduct an exterior search of the vehicle with a canine, based upon all of the indicators he had observed over the past three days. (*Id*. at 34:16-22.)

76. At one point while Defendant was in his car and TFC Volk was in the cruiser, Defendant's hand showed out of the window, so TFC Volk reengaged Defendant and Defendant asked about how long this engagement would take and whether he would get any points on his license. (*Id*. at 114:22-115:5.)

77. Troopers Mark Glista and Brett Kahler arrived, at which point Defendant exited the vehicle, and TFC Volk conducted a *Terry* frisk of Defendant outside of the vehicle. (*Id.* at 35:16-16:1; Def. Ex. D at 31:00-32:00.)

78. TFC Volk patted Defendant down because he was going to be out of his control, and because Trooper Glista, who would assume control of Defendant, had requested that he perform a *Terry* frisk. (ECF No. 144 at 117:24-118:1.)

79. Defendant also removed the dog from the car at TFC Volk's instruction, and walked the dog down the highway while the K-9 sweep took place. (*Id.* at 118:5-11.)

80. The canine alerted to a source of odor at the lower left-hand corner of the trunk seam of Defendant's vehicle. (*Id.* at 36:21-24.)

81. The canine's alert took place approximately 33 minutes after the initial traffic stop for speeding began, and approximately 20 minutes after Defendant denied consent for the search of his vehicle. (*Id.* at 118:12-21.)

82. After the canine alerted to Defendant's vehicle, TFC Volk applied for and received a search warrant to execute on Defendant's vehicle. (*Id.* at 37:5-21; Gov't Ex. 4.)

83. After TFC Volk obtained signatures from both the Assistant District Attorney and the District Magistrate, TFC Volk effectuated the search of Defendant's vehicle, during which he found 1,000 bricks of heroin in the trunk of Defendant's vehicle and after which Defendant made statements to and in the presence of the police. (ECF No. 144 at 37:22-38:9.)

**IV.     Conclusions of Law**

After reviewing the applicable law, the Court will separately address each of Defendant's arguments in support of his Motion to Suppress: (1) the April 5 Stop was not supported by probable cause (ECF No. 147 at 20-24); (2) the continued seizure of Defendant beyond the time necessary to complete the purpose of the traffic stop (Defendant's alleged speeding) violated the Fourth Amendment (*Id*. at 24-32); (3) the frisk of Defendant was not supported by reasonable suspicion that Defendant was armed and dangerous and violated the Fourth Amendment (*Id*. at 32-35); and (4) these Fourth Amendment violations require suppression of the heroin found in Defendant's car and the statements made by Defendant (*Id*. at 35).

**A.     Applicable Law**

The Fourth Amendment provides

> [T]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated, and no warrants shall issue, but upon probable cause supported by oath or affirmation, and particularly describing the place to be searched and the person or things to be seized.

U.S. Const. amend. IV. The protection of the Fourth Amendment is only triggered if the state invades an area in which the individual has a "constitutionally protected reasonable expectation of privacy." *New York v. Class*, 475 U.S. 106, 112, 106 S.Ct. 960, 89 L.Ed.2d 576 (1986) (quoting *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)). "It is settled that at a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial

judge." *U.S. v. Kennedy*, 2014 WL 6090409, at *6 (W.D. Pa. Nov. 13, 2014) (internal quotations omitted). "Generally, the burden of proof is initially on the defendant who seeks to suppress evidence." *Id.* (citing *United States v. Harris*, 2008 WL 3545827, at *6 (W.D.Pa. Aug. 12, 2008)). Once the defendant establishes a basis for the motion and makes a colorable claim, however, the burden shifts to the Government. *Id.*

B.        **Whether the April 5 Stop Was Supported by Probable Cause**

Defendant argues that when TFC Volk pulled him over on April 5, 2013, this stop was not supported by probable cause sufficient to believe that a speeding violation had occurred. Therefore, Defendant argues, TFC Volk's April 5, 2013, stop violated the Fourth Amendment. (ECF No. 147 at 21.) Specifically, Defendant argues that "the evidence does not support a finding that Trooper Volk maintained a close enough distance between himself and Mr. Green such that he could determine Mr. Green's speed with sufficiently reliable accuracy." (*Id.*)

In support of this argument, Defendant notes the fact that TFC Volk did not testify that Defendant was traveling faster than the rate of traffic, or that he was passing other vehicles on the road, and that in fact, TFC Volk testified that just before he pulled Defendant over, he had been traveling at the front of a line of vehicles, all traveling at approximately the same rate of speed. (*Id.* (Citing Def. Ex. D).) In addition, Defendant contends that TFC Volk could not possibly have maintained a constant distance between himself and Defendant when he was traveling "the length of two to three football fields behind Defendant's vehicle." (*Id.* at 22.)

The stop of an automobile, "even if only for a brief period of time and for a limited purpose," constitutes a seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10 (1996). Accordingly, such stops are subject to the constitutional

imperative that they are not unreasonable under the circumstances. Generally, this means that an automobile stop must be justified by "probable cause to believe that a traffic violation has occurred." *See U.S. v. Sanders*, 1998 WL 67547, at *1-2 (E.D.Pa. Feb. 18, 1998) (quoting *Whren*, 517 U.S. 806 (1996)). *See also U.S. v. Davenport*, 134 Fed.Appx. 523, 525 (3d Cir. 2005) ("Under Pennsylvania law, an officer may stop a car when there are articulable and reasonable grounds to suspect a violation of the Vehicle Code . . . Courts have held that this standard is analogous to a probable cause standard) (quotations and citations omitted).

The Court first notes that the fact that TFC Volk wanted to pull Defendant over before he knew that Defendant was speeding is not a ground for finding that there was a Fourth Amendment violation. Rather, "[a]ny violation of the traffic code provides a ground for a legitimate traffic stop, 'even if the stop is merely pretext for an investigation of some other crime.'" *U.S. v. Thach*, 411 Fed. Appx. 485, 488 (3d Cir. 2011) (quoting *United States v. Mosley*, 454 F.3d 249 (3d Cir. 2006)).

Pursuant to Pennsylvania law, the rate of speed of a vehicle may be timed by a police officer using a cruiser equipped with a speedometer. *See* 75 Pa.C.S.A. 3368. Pennsylvania law requires that, in ascertaining the speed through the use of a speedometer, the officer clock the individual for no less than three-tenths of a mile. *See id*. The statute also requires that the speedometer used for clocking have been tested for accuracy within one year prior to the alleged violation. *Id*.

Here, the Court has found that TFC Volk saw Defendant's vehicle on April 5, 2013, and recognized the vehicle as being Defendant's. TFC Volk then sped up to the point at which he was approximately one-tenth to two-tenths of a mile away from Defendant's vehicle, and

clocked his vehicle for approximately six-tenths of a mile. TFC Volk clocked Defendant's speed as 79 miles per hour, which was well over the posted speed limit of 65 miles per hour, in violation of the Pennsylvania Motor Vehicle Code.

There is no dispute that TFC Volk clocked Defendant for well over the requisite three-tenths of a mile. It is also undisputed that his speedometer was working accurately and had been tested for accuracy in March of 2013, approximately one month before the stop in question. (ECF No. 144 at 11-12; Gov't Ex. 1.) TFC Volk thus complied with the explicit requirements of Pennsylvania law when clocking Defendant and determining that he had committed a speeding violation.

Defendant nonetheless takes issue with the distance of approximately one-tenth to two-tenths of a mile that existed between TFC Volk's cruiser and Defendant's vehicle while TFC Volk clocked Defendant. In support of this argument, Defendant cites cases in which courts have held that an officer's clocking of speed supported a finding of probable cause, but notes that in each of these cases, the officers were closer to the vehicles they clocked than TFC Volk was to Defendant's vehicle. These cases, however, do not stand for the proposition that there is some minimum distance at which an officer must follow a defendant's vehicle to determine his speed with accuracy, and Defendant cites no case in which the court held that an officer followed the defendant from so far away that his clocking could not support a finding of probable cause. (*See* ECF No. 147 at 22-23; ECF No. 155 at 2.)

Therefore, the Court must assess whether TFC Volk had probable cause based on the facts and circumstances specific to this case, including the dash cam video, the beginning of which shows the approximate distance at which TFC Volk clocked Defendant, as well as TFC

Volk's testimony. The Court credits TFC Volk's testimony that he was able to follow Defendant for approximately six-tenths of a mile, while maintaining a consistent distance between himself and Defendant that allowed him to determine that Defendant was traveling at approximately 79 miles per hour. In crediting this testimony, the Court gives weight to the fact that TFC Volk has been a Pennsylvania State Trooper for over 24 years, and has patrolled eastbound and westbound traffic on the Pennsylvania Turnpike for much of that time. (*See* ECF No. 144 at 5-6.) There is no video recording of the approximately six-tenths of a mile during which TFC Volk clocked Defendant prior to pulling him over. (*See id.* at 93:5-8.) TFC Volk testified, however, that at the point that his dash cam began recording on April 5, 2013, he was approximately the same distance from Defendant's vehicle as he had been while clocking Defendant. The parties have agreed that this distance was between one-tenth to two-tenths of a mile. (*See id.* at 94:20-23; Gov't Ex. 2; Def. Ex. D.)

The Court has reviewed this video, and concludes that, at the distance depicted between Defendant's vehicle and TFC Volk's cruiser at the beginning of the video, TFC Volk was able to see Defendant's car sufficiently well such that he clocked Defendant's pace and determined that he was traveling at a rate of speed well over the posted speed limit of 65 miles per hour. The Court is not persuaded by the argument that TFC Volk had to be closer to Defendant's car to clock him accurately. While the Court can imagine a scenario in which a police cruiser is so far from the vehicle it is clocking such that the clocked speed might be inaccurate, the Court need not define the contours of such a scenario because it is clear to the Court that this case does not present such an issue. Rather, the Court finds that the distance portrayed at the beginning of the dash cam video of the April 5, 2013, stop was a distance from

which TFC Volk was able to accurately clock Defendant's vehicle traveling at approximately 79 miles per hour.

The Court therefore concludes that TFC Volk had probable cause to believe that Defendant was traveling at a rate of speed well over the posted speed limit of 65 miles per hour, and that his stop of Defendant was therefore lawful under the Fourth Amendment. *See Davenport*, 134 Fed.Appx. at 525 (holding that officer's automobile stop of the defendant was supported by probable cause when officer had clocked the defendant for five-tenths of a mile going fifteen to twenty-five miles per hour over the speed limit).

**C.      Whether the Continued Seizure of Defendant Beyond the Time Necessary to Complete the Purpose of the Traffic Stop Violated the Fourth Amendment**

In the alternative, Defendant argues that if TFC Volk had probable cause to stop Defendant for speeding, TFC Volk detained him beyond the time necessary to complete the purpose of the stop (i.e., to issue a warning or ticket for speeding). Defendant contends that this continued detention was not supported by reasonable suspicion and therefore ran afoul of the Fourth Amendment. (ECF No. 147 at 24.)

Defendant notes that "to justify an extension of the stop beyond the time necessary to issue a warning or speeding ticket, law enforcement must possess a reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." (*Id.* at 25 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).) Defendant asserts, however, that considering the totality of the circumstances, TFC Volk did not have this requisite reasonable suspicion to detain him. Defendant notes that even though TFC Volk ostensibly pulled him over for speeding, the

"purpose of the stop had nothing to do with speeding and everything to do with interdiction."

(*Id.* at 26-32.) In support of this argument, Defendant contends that the "indicators" upon which TFC Volk relied in forming his belief that Defendant was engaged in criminal activity were unreliable and should carry little weight. (*Id.*) For example, Defendant suggests that Philadelphia is not so far from the location of the stop such that it would be suspicious for him to travel there and back in one day. (*Id.* at 29.) In addition, Defendant suggests his "nervous chatter" when being pulled over should not support a finding of reasonable suspicion, because many citizens become nervous during traffic stops. (*Id.* at 29-30.) Defendant also points out that the presence of the dog in Defendant's car is of little significance, because TFC Volk has stated that he is unfamiliar with dogs and had only observed the dog in the vehicle on April 3, 2013, for a very short amount of time. (*Id.* at 30.) Defendant thus argues that TFC Volk could not be sure that it was the same dog in Defendant's car during the April 5, 2013, stop. (*Id.*)

"While reasonable suspicion must be more than an inchoate hunch, the Fourth Amendment only requires that police articulate some minimal, objective justification." *U.S. v. Frierson*, 611 Fed.Appx. 82, 85 (3d Cir. 2015) (citing *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003)) (internal quotations omitted). "Courts must consider the totality of the circumstances in light of the officer's experience. While individual factors giving rise to reasonable suspicion may be innocent in isolation, together they may serve to eliminate a substantial portion of innocent travelers." *Id.* (citing *United States v. Sokolow*, 490 U.S. 1, 13, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)) (internal quotations omitted).

To the extent Defendant argues that the pretextual nature of the stop was inappropriate or inconsistent with the Fourth Amendment, this assertion is not grounded in the law. As noted above, pretextual stops do not run afoul of the Fourth Amendment. Indeed, it is well established that "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action as long as the circumstances, viewed objectively, justify that action." *U.S. v. Leal*, 235 Fed. Appx. 937, 939 (3d Cir. 2007) (citing *Whren*, 517 U.S. at 813) (internal quotations omitted).)

Defendant cites *United States v. Peters*, 10 F.3d 1517 (10th Cir. 1993), for the proposition that an earlier stop of an individual cannot form the basis for reasonable suspicion to conduct a later stop of that individual, absent independent reasonable suspicion in the later stop. (ECF No. 147 at 31-32.) This case, however, is readily distinguishable from the case at hand. In *Peters*, the government attempted to base reasonable suspicion of criminal activity on the following factors: (1) having been informed of the defendants' Nigerian ancestry, (2) a properly executed lane change, which the government characterized as "abrupt"; and (3) "nervous conduct" by the defendants, during a stop of defendants by a different officer prior to the stop that produced the evidence at issue. *Peters*, 10 F.3d at 1521-22.

The court held that these factors were insufficient to form reasonable suspicion. *Id*. In reaching this conclusion, the court noted that the record did not support a finding that the defendants had behaved nervously, and rejected the government's argument that "slow driving is indicative of nervousness," particularly when the defendants were inexperienced drivers of a large vehicle. *Id*. at 1522. Further, the court found that there was "no factual basis, other than an inarticulable hunch . . . to suspect that the defendants' statements were not

completely accurate," and that nothing in the record cast any doubt upon the defendants' statements related to their story about their travel. *Id.* at 1521. Lastly, the court held that the "single, legal lane change" of defendants could not provide grounds for reasonable suspicion of criminal activity. *Id.* The court therefore concluded that the stop violated the Fourth Amendment.

Here, however, the totality of the circumstances indicate that TFC Volk had the objective, reasonable suspicion necessary to detain Defendant until the canine unit arrived to conduct a sweep of the vehicle. Defendant correctly notes that the Fourth Amendment would not have allowed TFC Volk to stop Defendant on April 5, 2013, based solely on the indicators he had observed during the stop on April 4, 2013, including the lining of Defendant's trunk being pulled back, the fact that Defendant's trunk could not be opened from the outside, the smell of raw marijuana emanating from the trunk, and Defendant's lack of luggage despite stating that he was traveling to Philadelphia for an indeterminate amount of time.

Defendant's continued detention during the April 5 stop, however, was based on far more than these indicators from the April 4 stop alone. Indeed, TFC Volk's reasonable suspicion on April 5 was independently supported by: (1) the fact that Defendant's stories about his travels to Philadelphia were inconsistent and contradictory, including the fact that he had returned from Philadelphia one day after he had told TFC Volk that he was traveling there for an indeterminate amount of time, (2) the presence of the dog in Defendant's car that TFC Volk believed was the same dog he had observed in the car of two individuals two days earlier who were known to be on pretrial release for drug-related violations, (3) the fact that Defendant was unsure of details about the dog, and that his story about the dog changed and

became contradictory, and (4) Defendant's nervous behavior. *See Leal*, 235 Fed. Appx. at 942 (holding that trooper had reasonable suspicion of criminal activity to justify continued detention of the defendant pending the arrival of the canine unit and that the 80-minute delay pending arrival of canine unit did not impermissibly exceed the scope of the stop).

### D. Whether the Frisk of Defendant Was Supported by Reasonable Suspicion that Defendant Was Armed and Dangerous

Defendant argues that TFC Volk failed to "articulate any justification for his pat-down of Mr. Green," other than the fact that Trooper Glista had asked him to do so. (ECF No. 147 at 33-34.) Defendant argues that the frisk was not supported by reasonable suspicion that he was armed and dangerous, and that the frisk therefore violated the Fourth Amendment. (*Id*. at 34.)

"After a traffic stop, an officer may frisk a person whom he has ordered out of the car if he has a reasonable suspicion that the person is armed." *Thach*, 411 Fed.Appx. at 489 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111-13, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam)). "Reasonable suspicion is formed when, under the totality of the circumstances, the officer reasonably believ[es] that his safety [is] threatened." *Id*. (citing *Terry*, 392 U.S. at 27). "The totality of the circumstances includes an officer's 'knowledge, experience, and common sense about human behavior.'" *Id*. (quoting *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002)).

Contrary to Defendant's assertions, TFC Volk provided many reasons based upon which he formed the requisite reasonable suspicion to conduct a pat-down of Defendant prior to relinquishing control of Defendant to Trooper Glista. As explained above, TFC Volk had observed several indicators of criminal activity over the course of the April 3, 4, and 5, 2013,

stops. These indicators included Defendant's behavior, the fact that the trunk of Defendant's vehicle could not be opened from the outside, the fact that the liner of the trunk had been tampered with, the fact that the trunk smelled of raw marijuana, the fact that Defendant's stories about his travels and about the dog in his car were inconsistent and contradictory, and the presence of a dog in Defendant's car that TFC Volk believed was the same dog he observed in the car of two individuals known to be on pretrial release for drug-related violations.

Based upon these indicators, the Court finds that TFC Volk's frisk of Defendant was supported by reasonable suspicion and was therefore lawful under the Fourth Amendment. TFC Volk had reasonable suspicion to believe that Defendant was engaged in drug related criminal activity. Therefore, based on TFC Volk's extensive experience and expertise, he had reasonable grounds to believe that Defendant could be armed and dangerous such that the frisk was warranted and did not run afoul of the Fourth Amendment prior to Trooper Glista assuming control over Defendant. *See Thach*, 411 Fed.Appx. at 489 (holding that frisk was lawful when individuals in vehicle were suspects in a drug investigation, and when officer knew, based on his experience and training, that guns often accompanied drugs, and when occupants' stories about their travel were inconsistent).

### E.    Whether the Evidence and Statements Should be Suppressed

Having determined that Defendant's Fourth Amendment rights were not violated by any of TFC Volk's actions, the Court denies his request that the evidence and statements obtained as a result of the stop and subsequent search be excluded. (*See* ECF No. 147 at 35.) Because there has been no Fourth Amendment violation, this evidence and Defendant's

statements will not be excluded based on the arguments Defendant presents in the instant motion.

**V.      Conclusion**

For the reasons stated above, Defendant's Motion to Suppress Evidence and Statements (ECF No. 121) is denied. An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | )      **CRIMINAL NO. 3:13-16** |
| | ) |
| | )      **JUDGE KIM R. GIBSON** |
| **v.** | ) |
| | ) |
| **WARREN CHARLES GREEN, IV,** | ) |
| | ) |
|          **Defendant.** | ) |

## ORDER

**AND NOW**, this 17th day of August, 2016, upon consideration of Defendant's Motion to Suppress Evidence and Statements (ECF No. 121), the Court having held a Suppression Hearing, and the parties having briefed the issues (*see* ECF Nos. 147, 154, 155), and in accordance with the foregoing Memorandum Opinion, **IT IS HEREBY ORDERED** that Defendant's Motion is **DENIED**.

**BY THE COURT:**

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**